**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Sean B. Runningeagle, | No. CV-98-1903-PHX-PGR |
| Petitioner, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Respondents. | |

On July 18, 2012, the Ninth Circuit ordered this Court to reconsider, in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), its procedural default rulings on a number of claims alleging ineffective assistance of counsel at trial and sentencing. (Doc. 139.) The Ninth Circuit directed the Court to (1) determine "whether the ineffective assistance of counsel claims that it previously found procedurally defaulted fall within *Martinez*"; (2) if so, address those claims on the merits; and (3) afford Petitioner an evidentiary hearing "if it determines one is warranted." (*Id.*)

This Court ordered the parties to brief the *Martinez* issue—that is, whether Petitioner's default of the claims can be excused by the ineffective performance of post-conviction counsel—and the merits of the defaulted claims. (Doc. 140.) The Court also ordered Petitioner to set forth any requests for evidentiary development. (*Id.*)

Petitioner's supplemental brief addresses only Claims 1-C, 1-H, and 17.[1] (Doc. 149.) Petitioner argues that his procedural default of these claims should be excused pursuant to *Martinez*. (*Id.*) He also requests evidentiary development on Claims 1-H and 17. (*Id.*)

For the reasons set forth herein, the Court finds that *Martinez* does not excuse the procedural default of the claims.

## **BACKGROUND**

Petitioner was convicted of two counts of first-degree murder and sentenced to death for the 1987 murders of Herbert and Jacqueline Williams. The following summary of the crimes is taken from the opinion of the Arizona Supreme Court affirming the convictions and sentences. *State v. Runningeagle*, 176 Ariz. 59, 61–62, 859 P.2d 169, 171–72 (1993).

In the early morning of December 6, 1987, Petitioner, his cousin Corey Tilden, and their two friends Orva and Milford Antone, were driving around Phoenix. Petitioner wanted parts for his car, so the group stopped at the Davis house, which had a car parked outside. Petitioner, Tilden, and Orva got out of the car, while Milford remained passed out drunk in the back seat. Petitioner used his large hunting knife to remove two carburetors from the Davis car. Orva put them and an air scoop in the trunk of

---

[1] Claim 17 encompasses several subparts, including 17-A and 17-D, alleging ineffectiveness performance of counsel at sentencing for failing to present mitigating information and failing to retain an independent mental health expert. Except where otherwise noted, the Court will refer to Petitioner's sentencing ineffectiveness allegations as Claim 17.

Petitioner's car. Tilden and Petitioner also stole a floor jack and tool box. Orva took a bicycle from the open garage.

Mr. and Mrs. Williams, an elderly couple, lived next door to the Davises. Mr. Williams came out of his house and told the young men to leave or he would call the police. Orva returned to the car, but Petitioner and Tilden approached Mr. Williams. Petitioner concealed his knife by his side. Tilden carried a large flashlight.

Petitioner began to tease and frighten Mr. Williams with the knife. Mr. Williams retreated and told Petitioner to put the knife away. Mrs. Williams then came out of the house and yelled at them. Tilden confronted Mrs. Williams, argued with her, and hit her on the side of the head with the flashlight. Mr. Williams told them to leave his wife alone, and helped her back into the house. Petitioner broke through the Williams' door with a tire iron, and he and Tilden barged in.

The noise awakened a neighbor, who heard Mrs. Williams crying and the words "bring him in" spoken by a tall, young man he saw standing in the Williams carport. The neighbor called 911, but by the time the police arrived, Mr. and Mrs. Williams were dead. Mr. Williams suffered several head injuries and five stab wounds, three of which were fatal. Mrs. Williams also suffered several head injuries, one of which fractured her skull and was possibly fatal, in addition to four stab wounds, three of which were fatal.

The police searched the Williams home. The drawer in which Mrs. Williams stored her jewelry was open and some jewelry was missing. They found an empty purse,

blood drops and two bloody shoe print patterns. They discovered Petitioner's palm print on the clothes dryer next to the bodies.

Petitioner discussed the crimes on several occasions before his arrest. He told his girlfriend that he had been in a fight with two people and had hit them "full-force." He showed her his car trunk full of the stolen property. He showed the hood scoop and carburetors to another friend.

When the defendants were arrested, the police found, among other things, the Davis air scoop with Petitioner's prints on it, two carburetors, the tool box, Mrs. Williams' wallet and college pin, a large black flashlight with Tilden's prints on it, and the Davis bicycle with Petitioner's prints on the wheel rim. A Phoenix Police Department criminalist matched Petitioner's shoes with the bloody shoe prints found at the Williams house, and also found that an inked print of Tilden's shoes made a pattern similar to other shoe prints at the house.

Petitioner, Tilden, and Orva Antone were indicted on two counts of first-degree murder, and various burglary counts. Antone pleaded guilty to burglary and testified for the state at the joint trial.

On July 27, 1988, a jury convicted Petitioner of two counts of first-degree murder, two counts of theft, and one count each of first-degree burglary, second-degree burglary, and third-degree burglary. (ROA 51; ME 7/27/88). On February 3, 1989, the trial court

sentenced Petitioner to death on the murder convictions.[2] (ROA 290.) That same day, Petitioner filed a Notice of Appeal with the Arizona Supreme Court.

On October 26, 1989, while his direct appeal was pending, Petitioner filed a *pro se* petition for post-conviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure, alleging, among other claims, ineffective assistance of counsel. (Doc. 21, Ex. B.) The trial court appointed attorney George Sterling as counsel.[3] (ME 11/12/89.) Sterling moved to withdraw based on Petitioner's allegation of a conflict of interest. (ROA 305.) Petitioner filed a *pro se* supplement to his PCR petition on December 7, 1989, alleging "ineffective/inefficient and incompetent legal counsel." (Doc. 21, Ex. C; ROA 306.) On March 21, 1990, the trial court appointed attorney John Antieau to replace Sterling. (ME 3/21/90.)

On March 27, 1990, Antieau, noting that the appellate record was not yet complete, moved for a 60-day extension of the deadline for filing supplemental pleadings. (ROA 309.) He filed another request, on April 29, 1990, which the court granted. (Docs. 311, 313.)

On May 8, 1990, the Arizona Supreme Court stayed the appeal and re-vested jurisdiction in the trial court to resolve the merits of the PCR petition. (Ariz.Sup.Ct.R. 19.)

---

[2] Co-defendant Tilden was also convicted on various counts, including two counts of first-degree murder, but received life sentences on the murder convictions. *Runningeagle*, 176 Ariz. 59, 61, 859 P.2d 169, 171.

[3] The Honorable Gloria Ybarra, of the Maricopa County Superior Court, presided over the trial and the first round of PCR proceedings.

On June 18, 1990, Antieau filed a motion seeking another 60-day extension, to allow him "sufficient time to compete his review of the trial record." (ROA 322.) The court granted the motion. (ROA 327.)

On November 20, 1990, after several additional deadline extensions (*see* ROA 331, 334, 337), Antieau filed a second supplemental petition. (ROA 339.) Antieau raised two claims of ineffective assistance of trial counsel: that counsel performed ineffectively by failing to move to sever Petitioner's trial from codefendant Tilden's and that counsel performed ineffectively during closing argument. (*Id.*) On April 19, 1991, the state trial court denied post-conviction relief, finding, with respect to the ineffective assistance claims, that Petitioner had not "presented material issues of fact and a 'colorable claim.'" (Doc. 21, Ex. F at 2; ROA 349.) The court also noted that the issue of severance was before the Arizona Supreme Court on direct appeal. (*Id.*)

Antieau then filed a motion for rehearing, which was also denied. (*Id.*, Ex's. G, H.; ROA 352, 355.) On July 15, 1991, Antieau filed a petition for review. (ROA 356.) The Arizona Supreme Court accepted review and consolidated Petitioner's PCR claims with his direct appeals claims. Antieau filed his opening appellate brief on August 29, 1991, again raising the two claims of ineffective assistance of counsel. (Doc. 21, Ex. A.)

On April 20, 1993, the Arizona Supreme Court issued its opinion affirming Petitioner's convictions and sentences and denying post-conviction relief. *Runningeagle*, 176 Ariz. 59, 859 P.2d 169. The court rejected Petitioner's claims of ineffective assistance of trial counsel. *Id.* at 63, 859 P.2d at 173.

Antieau did not represent Petitioner in the second PCR proceeding. The trial court originally appointed attorney Jess Lorona. (Doc. 21, Ex. I.) After the notice of post-conviction relief was properly issued, however, Petitioner filed a written motion to represent himself, which the trial court granted. (*Id.*, Ex's. Q, R.) Petitioner then wanted a Texas attorney to represent him. (*Id.*, Ex. S.) After the trial court denied the request, Petitioner filed a letter requesting to be allowed to proceed *pro per*. (*Id.*, Ex's. T, U.) Petitioner failed to timely file a PCR petition, and the trial court granted the State's motion to dismiss. (*Id.*, Ex's. T, V (Exhibit A), W.)

Petitioner later initiated a third PCR proceeding. Counsel Dennis Jones filed a 220-page PCR petition. (*Id.*, Ex. X.) The petition raised claims of ineffective assistance of counsel at trial and sentencing. (*Id.* at 23–30, 75–80, 97–142). It also alleged that Antieau was ineffective on appeal and in the first PCR proceeding. (*Id.* at 195–96.) The state trial court denied the petition.[4] (*Id.*, Ex. Y.) It found the ineffective assistance claims to be procedurally defaulted pursuant to Rule 32.2(a)(3) of Arizona Rules of Criminal Procedure because they had not been previously raised. (*Id.*) The court alternatively found that that the claims were not colorable. (*Id.*) The Arizona Supreme Court denied a petition for review. (*Id.*, Ex's. BB, at 3; CC.)

Petitioner filed his amended federal habeas petition on April 15, 1999. (Doc. 1.) The parties first addressed whether the asserted claims were procedurally defaulted. On February 6, 2004, this Court entered an order deciding the procedural status of

---

[4] The Honorable David R. Cole presided over the third round of PCR proceedings.

Petitioner's guilt-phase claims. (Doc. 90.) Among the claims found procedurally defaulted were three of the claims now at issue: 1-C (alleging that trial counsel was ineffective in not requesting second counsel), 1-H (ineffective assistance in not blaming Tilden for the murders), and 15 (alleging that Antieau was ineffective on appeal and in the first PCR proceeding). (*Id.*)

On March 10, 2006, this Court filed an order deciding the procedural status of Petitioner's sentencing-phase claims. (Doc. 108.) Among the claims found procedurally defaulted were Claims 17-A (ineffective assistance in not developing and presenting mitigation) and 17-D (ineffective assistance in not obtaining an independent expert for sentencing). (*Id.*)

After the parties briefed the merits of the non-defaulted claims and Petitioner's requests for evidentiary development, the Court issued its memorandum decision and order on November 27, 2007, denying relief and dismissing the habeas petition. (Doc. 132.) It also denied Petitioner's requests for evidentiary development. (*Id.* at 1, 37–44.) Finally, the Court ruled that Petitioner was not entitled to a certificate of appealability (COA) on any claim. (*Id.* at 44.)

The Ninth Circuit granted a COA on five claims: Claims 1-D, 2, 6, 15, and 19. (Ninth Circuit Docket, 15.) Petitioner chose not to present Claim 15 in his opening brief on appeal, but did raise the other four certified claims. (*Id.* at 25.) The Ninth Circuit panel heard oral argument on February 10, 2011. (*Id.* at 45.)

1

2        The panel issued its opinion on July 18, 2012. The majority opinion considered the

3    four claims that Petitioner raised on appeal, found them meritless, and affirmed this

4    Court's judgment denying habeas relief. *Runningeagle v. Ryan*, 686 F.3d 758, 763 (9th

5    Cir. 2012).

6

7        In a separate order issued the same day, the panel, with one dissent, granted

8    Petitioner's motion for a "limited remand" pursuant to *Martinez*.[5] (Ninth Circuit Docket,

9    59.) The order specified 12 claims that this Court had found procedurally defaulted. (*Id.*)

10
                                        **DISCUSSION**
11

12       Petitioner contends that Antieau performed ineffectively during the first PCR

13   proceedings by failing to raise certain claims that trial counsel performed ineffectively

14   during the guilt and sentencing phases of Petitioner's trial. Petitioner argues that under

15   *Martinez* Antieau's ineffective performance establishes cause and prejudice for the

16
17   default of Claims 1-D, 1-H, and 17.

18   **I.      APPLICABLE LAW**

19

20       **A.      Ineffective Assistance of Counsel**

21       Claims of ineffective assistance of counsel are governed by the principles set forth

22   in *Strickland v. Washington*, 466 U.S. 668 674 (1984). To prevail under *Strickland*, a

23
24   petitioner must show that counsel's representation fell below an objective standard of

25   _____

26       [5] Judge Bea, in dissent, wrote that, "The claims at issue were not appealed from
     the district court's adverse determination; thus, Runningeagle took the risk that, in the
27   event of an intervening change in the law, he would not benefit from such change."
     (Ninth Circuit Docket, 59.) Judge Bea also stated that Petitioner "appears very unlikely to
28   succeed" on the remanded claims. (*Id.*)

reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox. v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687–88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**B.**   *Martinez v. Ryan*

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In such situations, "federal habeas

review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Id. Coleman* also held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, the Court established a "narrow exception" to the rule announced in *Coleman*. The Court explained that,

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler,* 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez,* 132 S. Ct. at 1320)).

Subsequently, in *Trevino*, the Supreme Court extended *Martinez* to apply where a state's procedural rules do not forbid a defendant from raising an ineffective assistance of counsel claim on direct appeal, but make it "highly unlikely that a defendant will have a meaningful opportunity" to raise such a claim. 133 S. Ct. at 1921.

## II.   ANALYSIS

Petitioner argues that Antieau's ineffective performance during the first PCR proceedings excuses Petitioner's default of Claims 1-C, 1-H, and 17. Respondents offer

- 11 -

several counter-arguments. First, they contend that *Martinez* does not apply because "then-existing Arizona law did not bar Runningeagle from raising [ineffective assistance] claims as part of the appeal, and he in fact presented such issues to the Arizona Supreme Court." (Doc. 156 at 9.) Next, Respondents argue that *Martinez* is inapplicable because both the PCR ineffectiveness allegation and the allegations of trial counsel ineffectiveness in Claims 1-C and 1-H were summarily rejected on the merits in state court. (*Id.* at 9–10.) Respondents also argue that Antieau's performance on direct appeal and during the first PCR proceedings was not ineffective under *Strickland*. (*Id.* at 11–12.) Finally, Respondents contend that Petitioner's underlying claims of ineffective assistance of trial counsel are not substantial under *Martinez*. (*Id.* at 13.) The Court addresses these arguments as follows.

### A.  *Martinez* **does not apply**

As the Supreme Court noted, at the time the petitioner in *Martinez* filed his direct appeal, in 2002, Arizona did not permit a defendant to allege ineffective assistance of trial counsel on direct appeal. Previously, however, Arizona law permitted appellants to raise ineffectiveness claims on direct appeal, develop those claims by staying the appeal pending an evidentiary hearing in the trial court, and then consolidate review of the post-conviction hearing with the direct appeal.

In *State v. Zuck*, 134 Ariz. 509, 515, 658 P.2d 162, 168 (1982), the appellant raised an ineffectiveness claim on appeal and the Arizona Supreme Court remanded to the lower court for a hearing on the issue. The court remarked that "when the issue of

competency of trial counsel has been raised, we have always resolved the matter with whatever was before us in the record and without giving trial counsel an opportunity to be heard. However, we believe that in some cases where this issue is raised, it would be appropriate to remand the case for a hearing on the question." *Id.*; *see also Lambright v. Stewart*, 241 F.3d 1201, 1203 (9th Cir. 2001) (observing that at the time of Lambright's default of an ineffective assistance claim in the mid-1980s, Arizona law permitted claim of ineffective assistance to be raised on direct appeal).

In 1989, two years before Petitioner filed his opening brief on direct appeal, the Arizona Supreme Court reiterated its preference for staying an appeal pending development of ineffectiveness claims in a post-conviction hearing before the trial court:

> Generally, this court is reluctant to decide claims of ineffective assistance in advance of an evidentiary hearing to determine the reasons for counsel's actions or inactions on any particular point. . . .
> . . . .
>
> As a general matter, we recommend that when a defendant wishes to raise the question of ineffective assistance during the pendency of his appeal, he should file the proper petition under Rule 32, Ariz. R.Crim. P., 17 A.R.S., in the trial court and seek an order from the appellate court suspending the appeal. The trial court should then hold an evidentiary hearing and make its ruling. Afterward, a defendant should seek to consolidate the post-conviction proceedings with the direct appeal.

*State v. Valdez*, 160 Ariz. 9, 15, 770 P.2d 313, 319 (1989); *see State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).

It was not until 1995, four years *after* Petitioner filed his appeal, that the Arizona Supreme Court abandoned its preference for suspending appeals pending evidentiary

development of ineffectiveness claims in a post-conviction proceeding. As the court explained in *Krone v. Hatham*, 181 Ariz. 364, 890 P.2d 1149 (1995):

> We once routinely stayed appeals pending resolution of Rule 32 proceedings, but that practice proved unworkable and resulted in long delays. *See, e.g., State v. Vickers,* 180 Ariz. 521, 885 P.2d 1086 (1994) (five years from conviction to disposition on appeal). Now, we will almost never allow a Rule 32 proceeding to delay a direct appeal.
>
> We are aware that our present practice may appear to conflict with the practice suggested by cases starting with *State v. Valdez*. . . . However, the practice of staying appeals pending resolution of Rule 32 proceedings has proven unsuccessful, and we will no longer engage in it, barring the most exceptional circumstances.

*Id.*, 890 P.2d at 1151. The practical effect of *Krone* was the elimination of direct appellate review of ineffectiveness claims developed in a postconviction proceeding.

Finally, in *State v. Spreitz*, 202 Ariz. 139, 3 P.3d 525, 527 (2002), the Arizona Supreme Court expressly ruled that ineffectiveness claims raised on direct appeal would not be entertained and must be presented solely in a post-conviction petition following appeal. The court held that "ineffective assistance of counsel claims are to be brought in Rule 32 [PCR] proceedings." *Id.*; *see Lambright*, 241 F.3d at 1203 (finding preclusion under Arizona's Rule 32 inadequate to bar ineffectiveness claim because at the time of the alleged procedural default Arizona law permitted but did not require that ineffectiveness claims be raised on appeal).

Accordingly, at the time of Petitioner's appeal, Arizona did not bar him from raising ineffectiveness claims on appeal and in fact provided for direct appellate review of such claims. *See Martinez*, 132 S. Ct. at 1320 (emphasizing that the Court's holding is

- 14 -

limited to situations "where the State barred the defendant from raising the claims on direct appeal"). Pursuant to the process endorsed in *Valdez*, Petitioner raised ineffective assistance claims in a post-conviction proceeding and then consolidated those claims with the other issues raised on appeal.

As previously noted, in *Trevino*, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to cases in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal. . . ." Petitioner argues that under *Trevino* the principle announced in *Martinez* applies to Petitioner's defaulted ineffective assistance claims. (Doc. 159 at 6–7.)

In *Trevino*, the Court noted two features of Texas' procedures that necessitated application of *Martinez*, despite the fact that the state did not expressly require defendants to raise ineffective assistance claims in collateral proceedings rather than on direct appeal. First, "Texas procedure makes it 'virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim' on direct review." 133 S. Ct. 1918 (citation omitted). The Court noted that by their very nature ineffective assistance of counsel claims require information outside of the trial court record. *Id.* Although a convicted defendant may seek to develop additional evidence by moving for a new trial, Texas procedural rules impose timelines making the process unrealistic. *Id.* Next, the Court explained that, "were *Martinez* not to apply, the Texas procedural system would create significant unfairness. That is because Texas courts in effect have directed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review." *Id.* at 1319.

These concerns were not present in the Arizona procedure in place at the time of Petitioner's appeal. First, because the direct appeal was stayed pending resolution of the PCR proceedings, the time constraints noted in *Trevino* were not present.

Second, in Petitioner's case, Arizona law accommodated precisely the procedures Petitioner used to raise his ineffective assistance of counsel claims. Arizona courts, unlike the Texas courts described in *Trevino*, did not "strongly discourage" defendants from raising such claims on direct appeal, *Trevino*, 133 S. Ct. at 1320, but instead recommended that "that when a defendant wishes to raise the question of ineffective assistance during the pendency of his appeal, he should file the proper petition under Rule 32 . . . in the trial court and seek an order from the appellate court suspending the appeal." *Valdez*, 770 P.2d at 319. After the trial court rules on the Rule 32 petition, the "defendant should seek to consolidate the post-conviction proceedings with the direct appeal." *Id.*

Thus, at the time of Petitioner's appeal, Arizona courts were not directing defendants away from the procedure he followed in raising his ineffective assistance claims. Numerous other capital appellants followed the recommended *Valdez* course, and the Arizona Supreme Court routinely consolidated review of the post-conviction hearing with the direct appeal, thus providing direct appellate review of ineffectiveness claims. *See, e.g., State v. Vickers*, 180 Ariz. 521, 525–57, 885 P.2d 1086, 1090–92 (1994)

1
2
3
4
5
6
7
8
9
10
11

(reversing conviction based on claim of ineffective assistance of counsel developed in post-conviction evidentiary hearing); *State v. Henry*, 176 Ariz. 569, 685–86, 863 P.2d 861, 877–78 (1993) (affirming ineffectiveness claims denied following state post-conviction evidentiary hearing); *State v. Salazar*, 173 Ariz. 399, 414–15, 844 P.2d 566, 581–82 (1992) (same); *State v. Amaya–Ruiz*, 166 Ariz. 152, 179–92, 800 P.2d 1260, 1287–90 (1990) (same); *State v. Rockwell*, 161 Ariz. 5, 12–13, 775 P.2d 1069, 1076–77 (1989) (reviewing ineffective assistance at trial); *State v. McCall*, 160 Ariz. 119, 127, 770 P.2d 1165, 1173 (1989) (reviewing alleged ineffectiveness of counsel at resentencing).

12
13
14
15
16
17

Again, Petitioner followed this procedure and raised ineffective assistance of counsel claims in a Rule 32 petition, which was later consolidated with his direct appeal. As described in more detail below, Antieau sought to develop new evidence, retaining a mental health expert and an investigator. The trial court and the Arizona Supreme Court reviewed the ineffective assistance claims raised by Antieau.

18
19
20
21
22
23
24
25
26
27
28

A number of federal circuit and districts court have considered the applicability of *Martinez* and *Trevino* to a state's procedures for raising ineffective assistance of counsel claims. In *Nash v. Hepp*, 740 F.3d 1075, 1079 (7th Cir. 2014), the Seventh Circuit noted that "Wisconsin law expressly allows—indeed, in most cases requires—defendants to raise claims of ineffective assistance of trial counsel as part of a consolidated and counseled *direct* appeal, and provides an opportunity to develop an expanded record." In Illinois, district courts have found *Martinez* and *Trevino* inapplicable because "Illinois allows ineffective assistance claims to be raised on direct appeal." *O'Quinn v. Atchison*,

No. 12-cv-746-DRH-CJP, 2014 WL 1365455, at *5 (S.D.Ill. April 7, 2014); *see Murphy v. Atchison*, No-C-3106, 2013 WL 4495652, *22 (N.D.Ill. August 19, 2013) ("In Illinois, collateral proceedings are not the first opportunity to raise an ineffective assistance of counsel claim."). In *Williams v. Rock*, No. 09-CV3576(JS), 2014 WL 3882331, at *3 (E.D.N.Y. August 6, 2014), a court in the Eastern District of New York found *Martinez* and *Trevino* inapplicable because "Petitioner could have raised his ineffective assistance of counsel on direct appeal."

Other courts have found *Martinez* and *Trevino* applicable given a state's procedural rules. *See, e.g.*, *Sutton v. Carpenter*, 745 F.3d 787, 792–94 (6th Cir. 2014); *Harms v. Cline*, --- F.Supp.2d ----, 2014 WL 2694200, at *11 (D.Kan. June 13, 2014); *Weber v. Sinclair*, No. C08-1676RSL, 2014 WL 1671508, at *8  (W.D.Wash. April 28, 2014); *Brown v. Thomas*, No. 2:11–CV–3578–RDP, 2013 WL 5934648, at *2 (N.D.Ala. Nov. 5, 2013); *Raglin v. Mitchell*, No. 1:00cv767, 2013 WL 5468227, at *7 (S.D.Ohio Sept. 29, 2013). In these cases, the court noted that the state procedures implicated the same concerns that formed the basis of the Supreme Court's ruling in *Trevino*. In *Sutton*, for example, the Sixth Circuit explained that "Tennessee's procedural rules make it almost impossible for a defendant in a typical case to adequately present an ineffective-assistance claim on direct appeal," and that Tennessee courts have directed defendants to raise ineffective assistance claims on collateral review. 745 F.3d at 792–93. In *Harms*, the court explained that *Trevino* applied because Kansas courts had held that collateral review rather than direct appeal was the appropriate means for raising ineffective

assistance of counsel claims. 2014 WL 2694200, at \*11. The court further explained that "the same practical considerations which led to the *Trevino* holding, such as the need for a new lawyer, the need to expand the trial court record, and the need for sufficient time to develop the claim, argue strongly for initial consideration of Petitioner's claim during collateral, rather than on direct, review." *Id.*

Again, neither the procedures in place at the time of Petitioner's appeal, nor the practical considerations discussed in *Trevino*, support the applicability of *Martinez* and *Trevino* to Petitioner's case. Pursuant to then-applicable Arizona procedures, Petitioner was appointed new counsel for his appeals and PCR proceedings. Then the appeal was stayed while he pursued post-conviction relief, including ineffective assistance claims. He was not, in sum, barred from raising the defaulted ineffective assistance of counsel claims, nor was it highly unlikely that the claims would be heard.

### B.   Application of *Martinez* does not entitle Petitioner to relief

Next, the Court finds that even if *Martinez* did apply to Petitioner's case, it does not provide cause to excuse the procedural default of these claims. PCR counsel's performance was neither deficient nor prejudicial under *Strickland*.

Under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate

that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014); *Dickens v. Ryan*, 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc); *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

In a series of recent cases the Ninth Circuit has provided guidelines for applying *Martinez.* The most recent case, *Clabourne*, summarized the court's *Martinez* analysis as follows:

> To demonstrate cause and prejudice sufficient to excuse the procedural default, therefore, *Martinez* and *Detrich* require that Clabourne make two showings. First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. Second, to establish "prejudice," he must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

*Clabourne*, 745 F.3d at 377 (citations omitted).[6]

**1.    Claims 1-C and 1-H**

---

[6] In *Detrich*, a plurality of the en banc panel held that "a prisoner need show only that his PCR counsel performed in a deficient manner" and "need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez* requirement." 740 F.3d at 1245 (W. Fletcher, J., plurality). However, as the court noted in *Clabourne*, a majority of the *Detrich* panel rejected that view and concluded instead that to demonstrate cause "the petitioner must show that his post-conviction relief counsel was ineffective under *Strickland*. . . ." *Clabourne*, 745 F.3d at 376; *see Sexton*, 679 F.3d at 1157.

- 20 -

In Claim 1-C, Petitioner alleges that trial counsel rendered ineffective assistance by failing to request the appointment of second counsel to assist him in trying Petitioner's case. (Doc. 149 at 15–16.) In Claim 1-H, Petitioner alleges that counsel performed ineffectively by failing to develop a theory of defense implicating co-defendant Tilden as the actual killer (*Id.* at 17–24.)

Antieau did not raise these claims on appeal or in the first PCR proceedings. Petitioner raised the claims in his third PCR proceeding. (Doc. 21, Ex. X.) As this Court noted in its interim order on the procedural status of Petitioner's claims (Doc. 90 at 13), the state court ruled that the claims were precluded as waived under Ariz.R.Crim.P. 32(a)(3). (Doc. 21, Ex. Y at 1.) Alternatively, the PCR court dismissed the claims summarily on the merits pursuant to Rule 32.6(c). (*Id.*)

Respondents argue that the state court's summary denial was a decision on the merits under *Harrington v. Richter*, 131 S. Ct. 770 (2011), thereby triggering the "double deference" standard for review of ineffective assistance of counsel claims under the AEDPA.[7] (Doc. 156 at 16–17.) Petitioner contends that the court never reached the merits and therefore this Court must review the claims *de novo*. (Doc. 159 at 9–12.) The Court need not resolve this issue, because under any standard of review the claims are not substantial and Antieau did not perform at a constitutionally ineffective level by failing to raise them.

---

[7] In *Harrington v. Richter*, the Supreme Court held that a claim is "adjudicated on the merits" for purposes of 28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act even where the state court issued only a summary denial. 131 S. Ct. at 784–85.

1

2

a.      Claim 1-C

3

Petitioner was represented at trial and sentencing by attorney Balthazar Iniguez. In

4

arguing that Iniguez performed ineffectively at Petitioner's 1988 trial, Petitioner contends

5

6

that the prevailing standard of care was set forth in the 1989 ABA Guidelines, which

7

stated that "[i]in cases where the death penalty is sought, two qualified attorneys should

8

be assigned to represent the defendant." (Doc. 149 at 15, quoting 1989 ABA Guideline

9

10

2.1.) Therefore, according to Petitioner, Iniguez performed deficiently by failing to

11

request the appointment of second counsel.

12

Failure to seek the appointment of second counsel can give rise to habeas relief

13

only if this Court first determines that the absence of co-counsel prejudiced the defense.

14

15

*Cf. Allen v. Woodford*, 395 F.3d at 998 (explaining there can be no deficient performance

16

unless the record shows that counsel was unable to try the case alone); *Riley v. Taylor*,

17

277 F.3d 261, 306 (3d Cir. 2001) ("The Constitution does not specify the number of

18

19

lawyers who must be appointed. If a single attorney provides reasonably effective

20

assistance, the Constitution is satisfied, and if a whole team of lawyers fails to provide

21

such assistance, the Constitution is violated."); *see also Ortiz v. Stewart*, 149 F.3d 923,

22

23

933 (9th Cir. 1998) (explaining that "[i]t is well established that an ineffective assistance

24

claim cannot be based solely on counsel's inexperience").

25

Petitioner contends that he was prejudiced by the cumulative effect of Iniguez's

26

errors, "which may well have been prevented by the appointment of second counsel."

27

28

(Doc. 149 at 16.) As specific examples of Iniguez's ineffective performance, Petitioner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

cites the allegations in Claims 1-H and 17. (*Id.*) Because Claim 1-C does not state a claim independent of Petitioner's other ineffective assistance claims, which the Court will address next, it is not substantial and its procedural default is not excused under *Martinez*.

    **b.**    <u>Claim 1-H</u>

Petitioner alleges that trial counsel rendered ineffective assistance by failing to develop a defense theory implicating co-defendant Tilden as the killer. (Doc. 149 at 17–24.)

At the joint trial, Tilden offered an alibi defense, while Petitioner's defense was that there was insufficient evidence to find him guilty beyond a reasonable doubt. *Runningeagle*, 176 Ariz. at 68–69, 859 P.2d at 178–79. On direct appeal, the Arizona Supreme Court found that the two strategies were not mutually exclusive. *Id.* at 68, 859 P.2d at 178. The Ninth Circuit agreed with the Arizona Supreme Court's assessment that the jury could have believed both Tilden's alibi argument and Petitioner's insufficiency of the evidence argument. *Runningeagle*, 686 F.3d at 777. As the court explained, "[t]hat Tilden highlighted the state's paucity of evidence as to his guilt by focusing on the physical evidence implicating Runningeagle does nothing to change this fact." *Id.*

Trial counsel's performance was not deficient under *Strickland*. As Respondents note, the evidence presented at trial pointed to Petitioner as the person who stabbed the victims. The trial court in its special verdict found that "there is no evidence to indicate that Defendant Tilden inflicted any of the horrendous stab wounds. All the evidence points to defendant Running Eagle [sic] who owned the survival knife, whose palm print

was found in the laundry room above the bloody bodies." (ROA 290 at 16–17.) The Arizona Supreme Court agreed with the trial court's finding that Petitioner "in fact killed the victims." *Runningeagle*, 176 Ariz. at 64, 859 P.2d at 174. This Court concluded that the evidence supported a finding that Petitioner committed the murders, noting that "Petitioner's knife, which he used to threaten the couple, was seized from his vehicle and found to be consistent with the wounds suffered by the victims." (Doc. 132 at 27.) Finally, the Ninth Circuit characterized as "overwhelming" the "evidence that Runningeagle did the stabbing." 686 F.3d at 770.

According to Petitioner, the courts' view of the evidence as clearly implicating Petitioner as the murderer is a product of trial counsel's failure to shift the blame to Tilden. (Doc. 159 at 16.) However, Petitioner does not explain how such a strategy would have countered the palm print evidence and the evidence showing that Petitioner owned a knife consistent with the knife that caused the victims' wounds, and was seen threatening the victims with a knife before they were stabbed.

Petitioner asserts that counsel could have supported the theory that Tilden was the actual killer by presenting evidence of Tilden's bad character, including his "long history of emotional outbursts and violence." (Doc. 149 at 20.) Respondents are correct, however, that this evidence would likely have been inadmissible under Rule 404(a) of the Arizona Rules of Evidence ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."). *See, e.g.*, *State v. Nordstrom*, 200 Ariz. 229, 243, 25 P.3d 717, 731 (2001),

*overruled on other grounds*, *State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012); *State v. Bocharski*, 200 Ariz. 50, 58, 22 P.3d 43, 51 (2001).

### 2.    Claim 17

Petitioner alleges that Iniguez "failed to present readily available and compelling mitigation evidence." (Doc. 149 at 27.) This information concerned Petitioner's impoverished childhood and dysfunctional home life, his family background of alcoholism and mental health issues, his medical history, and his own alcoholism. (*Id.* at 32–50.) Petitioner also faults Iniguez for failing to retain an independent mental health expert to evaluate Petitioner, with a focus on Petitioner's cultural background as a Native American. (*Id.* at 51–61.) Petitioner asserts that his default of this claim is excused by PCR counsel's ineffective performance.

In his third PCR petition, Petitioner alleged that Antieau performed ineffectively on direct appeal and during the first PCR proceeding. (Doc. 21, Ex. X at 195–96.) The state court found the claim precluded as waived under Ariz.R.Crim.P. 32(a)(3) (*id.*, Ex Y), and this Court found the claim procedurally barred (Doc. 108 at 18).

To show that Antieau's ineffective performance caused the default of this claim, Petitioner must "establish that both (a) [Antieau's] performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377. As described below, Antieau's performance was not deficient or prejudicial under *Strickland*.

a.    Sentencing proceedings

Following Petitioner's conviction, Iniguez moved for mental health examinations under Rule 26.5 of the Arizona Rules of Criminal Procedure, which provides for court-ordered evaluations prior to sentencing. Psychologists Michael Bayless and Francis Enos evaluated Petitioner and prepared reports which were submitted to the court, along with an evaluation completed by another psychologist, Dr. Roger Martig, in 1982, in connection with a juvenile sexual assault proceeding.

Dr. Martig's report concluded that Petitioner has "a significant amount of repressed anger," and diagnosed him as having "conduct disorder, undersocialized, aggressive." (ROA 257 at 9.) In discussing Petitioner's background, Dr. Martig noted that there was abuse between Petitioners' parents. (*Id.* at 2.)

Dr. Bayless diagnosed Petitioner with antisocial personality disorder, "a characterological disorder and one that is extremely difficult to treat. (Doc. 149, Ex. 2.) He opined that Petitioner "is dangerous to the community" and recommended that he be placed is a "secure, structured environment." (*Id.* at 5.)

Dr. Enos concluded that Petitioner "does not suffer from any of the usual psychiatric diagnostic patterns involving any of the major emotional disorders such as manic/depressive psychosis or schizophrenia. He does not appear to be suffering from any of the neurotic mechanisms or anxiety reactions. His primary problem appears to be sociopathic. . . ." (ROA 258 at 10.) Dr. Enos elaborated that Petitioner "gets a pleasure out of 'twisting the tail of the authority' and doing what he wants, when he wants, and

where he wants it. In fact, he gets a certain amount of excitement—which may be a secondary sexual satisfaction—out of terrorizing people and getting by with it." (*Id.*)

Drs. Martig, Bayless and Enos all measured Petitioner's intelligence as in the superior range.

Iniguez filed a sentencing memorandum advancing several mitigating circumstances. (ROA 229.) He argued that there was no direct evidence that Petitioner committed the murders; that Petitioner was intoxicated on "jungle juice" and beer when the crimes were committed; that he suffered from a long-term drinking problem; that the murders were not planned but impulsive acts committed while Petitioner's "mind was impaired by alcohol"; that Petitioner was raised by alcoholic parents; and that Petitioner did not have a violent record and the murder was out of character. (*Id.* at 1–3.) Iniguez argued in support of three statutory mitigating circumstances: that Petitioner's intoxication diminished his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law; that the crime was committed under unusual or substantial stress because Petitioner was struggling to adjust to a new social setting in Scottsdale, Arizona, after living on a reservation in South Dakota; and Petitioner's age of 18. (*Id.* at 5–7.) Iniguez also challenged the three aggravating circumstances alleged by the state. (*Id.* at 3–5.)

Prior to sentencing, the probation department prepared, and the trial court reviewed, two pre-sentence reports. The first report was authored by Deputy Adult Probation Officer Cathy Hontz. (ROA 232.) The "social history" section of the report

was based on information provided by Petitioner and taken from his juvenile court file. (*Id.* at 7.) The report stated that Petitioner's mother and stepfather were alcoholics, but apart from their drinking Petitioner "experienced no significant difficulties during his youth." (*Id.*) The report detailed Petitioner's educational and employment background. (*Id.* at 7–8.) In a section on "substance use," the report noted that Petitioner first experimented with alcohol at age 11, began drinking regularly at 16, and "experienced a number of personal difficulties due to drinking." (*Id.* at 8.) The "health" section of the report noted Petitioner's asthma, a broken collarbone he suffered at age 8, an incident where Petitioner was knocked unconscious during an altercation in 1981, and an incident at age 12 when Petitioner almost died as a result of improperly treated double pneumonia. (*Id.* at 9.) The mental health section referenced Dr. Martig's 1982 psychological evaluation.

A second pre-sentence report was prepared by Probation Officer Debbie Vaughn. (ROA 254.) Vaughan spoke with Petitioner's juvenile probation officer, who supervised Petitioner when he was around 12 years old. (*Id.* at 7.) According to the officer, "there was a great deal of dysfunction in the family" and she was tempted to contact child protective services. (*Id.*) There was little stability or structure in the home, and Petitioner "basically 'raised himself.'" (*Id.* at 5.) Petitioner's "family had very little furniture and household provisions and on many occasions there was no food in the house." (*Id.*) The probation officer described Petitioner's family as difficult to work with, stating "they would continually relocate in efforts to evade the probation department." (*Id.*) There was

little warmth or closeness among Petitioner's family members. (*Id.*) Alcohol abuse appeared to be a factor in the family's dysfunction. (*Id.* at 5.)

The court also received 15 letters submitted on Petitioner's behalf. These included letters from his mother and from employers, school counselors, and family friends. (*See* ROA 261–69.) These letters all portrayed Petitioner in a positive light. Petitioner's mother described his many good qualities, including his kindness, gentle character, generosity, love for his family, and intelligence. Petitioner's mother also described his serious asthma condition. (ROA 261.) The letter did not raise additional red flags about the family's home life. (*Id.*) The family was happy, according to Petitioner's mother, even in the absence of a lot of material goods.  (*Id.*) Petitioner himself wrote two letters to the court. (ROA 260, 273.)

At the aggravation/mitigation hearing, Iniguez presented several witnesses to testify on Petitioner's behalf, including Petitioner's mother and stepfather, as well as other family members and friends. (RT 12/9/98.) The testimony focused on Petitioner's family background, including the fact that his parents struggled with alcohol, that Petitioner did not know his biological father, and that the family moved frequently during Petitioner's childhood. Petitioner's witnesses all testified that Petitioner was a kind, non-violent, and hard-working person whose participation in the crime was shocking and out of character, and likely the product of intoxication. (*Id.* at 5–106.)

Petitioner also testified and asked for a life sentence. (*Id.* at 82.) He insisted that he and Tilden did not commit the murders and complained of misconduct on the part of the

jury, witnesses, and prosecutor. (*Id.* at 83–91.) He explained he could not show remorse, being innocent of the crimes, but stated that said he felt "bad for the people for losing them and for the people that died themselves." (*Id.* at 83–84.)

Subsequently, during oral argument on the aggravating and mitigating circumstances, Iniguez urged the court to consider as mitigating circumstances Petitioner's youth and background as a Native American trying to adjust to white society. (RT 1/13/89 at 57–58.) Iniguez argued that at the time of the crimes Petitioner was intoxicated on beer and "jungle juice," a potent concoction made with a grain alcohol called Everclear. (*Id.* at 62; *see id.* at 75.) He also argued that as a Native American Petitioner was particularly vulnerable to the effects of alcohol. (*Id.* at 63.) He characterized Petitioner as respectful and caring when sober, with no violent propensities. (*Id.* at 73.)

Iniguez disputed aspects of Petitioner's anti-social personality diagnosis but noted that with treatment and the passage of time Petitioner would cease to pose a danger. (*Id.* at 57, 65–67.) He argued that a personality disorder combined with alcohol consumption diminished Petitioner's capacity to conform his conduct to the requirements of the law. (*Id.* at 67.)

Iniguez also challenged the aggravating factors advanced by the state, and characterized the killings as impulsive rather than premeditated and out of character for Petitioner, who was not a violent person and was living a normal and productive life before the crimes. (*Id.* at 67–69.) Finally, in arguing for a life sentence, Iniguez described

Petitioner as an intelligent, polite, and courteous person loved by his family. (*Id.* at 71.) Iniguez repeated these arguments at the sentencing hearing. (RT 2/3/89 at 9–13.)

The trial court in its special verdict indicated that it had considered Petitioner's letters and those written on his behalf; the psychological reports by Drs. Martig, Bayless, and Enos; and the pre-sentence reports (ROA 290 at 1–2.) The court found three aggravating factors: that Petitioner committed the murder for pecuniary gain; that the murders were committed in an especially cruel, heinous, or depraved manner; and that each murder was committed during the commission of the other murder. (*Id.* at 4–8.)

With respect to mitigation, the court found that Petitioner's alcohol consumption prior to the murders "certainly did not rise to the level of a defense nor was it even sufficient to indicate that it affected [Petitioner's] physical or mental abilities" and did not affect his "capacity to appreciate the wrongfulness of his conduct nor his ability to conform his conduct to the requirements of the law." (*Id.* at 8–9.)

The court found that Petitioner's age was a mitigating factor, but not sufficient to call for leniency. (*Id.* at 10.)

The court also found that the psychological reports did not contain mitigating information. Dr. Martig's report indicated that Petitioner suffered from emotional problems requiring treatment but did not diagnose Petitioner with "any one significant impairment." (*Id.* at 9.) The court then noted that the reports prepared by Drs. Bayless and Enos reached "amazingly similar" conclusions, finding that Petitioner has superior intelligence, is in contact with reality, and "is not suffering from any type of mental

disorder or disease that would either serve as a defense nor in any way impair his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the rights [sic] of the law." (*Id.*) The reports also indicated that Petitioner "does not have the types of feelings or emotions that people usually have for family or friends. His concern is for himself and his own appetites." (*Id.* at 9–10.) The court stated, however, that it did not use this information as aggravating circumstances. (*Id.* at 9.)

The court sentenced Petitioner to death but imposed a life sentence on co-defendant Tilden. The court found that Tilden's "character, family background, and psychological prognosis" called for mitigation. (*Id.* at 16.) The court noted that Tilden grew up with no father figure and experienced frequent abandonment by his mother. (*Id.* at 15–16.) In contrast to Petitioner, Tilden was able to feel remorse. (*Id.* at 16.) Although he was diagnosed by a defense expert as suffering from narcissistic personality disorder, in the court's view Tilden, unlike Petitioner, was capable of rehabilitation. (*Id.*)

The court also distinguished Tilden's "degree of participation" in the crimes, characterizing Petitioner as the initiator of the events that led to the murders and "the intelligent, charismatic leader that [his] younger cousin Tilden followed." (*Id.* at 16, 17.) The court also noted that the evidence showed it was Petitioner who stabbed the victims. (*Id.* at 17.)

b.     PCR proceedings

In his supplemental PCR petition, Antieau raised 11 claims, including the claims that trial counsel performed ineffectively by failing to move to sever Petitioner's trial and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

performed ineffectively during closing argument. (ROA 339.) In the first of these ineffective assistance claims, Antieau argued that as a result of counsel's failure to move to sever, Petitioner was "confronted with two prosecutors," the second one being co-defendant Tilden's counsel. (*Id.* at 3.) According to Antieau, "[t]hat posture continued through sentencing, when Tilden presented, and the Court adopted, some distinction between 'narcissistic personality disorder' and 'antisocial personality disorder' sufficient to warrant leniency for Tilden but not for Petitioner." (*Id.*)

Antieau also alleged that the trial court "misconstrued" Petitioner's mental health mitigation evidence. (*Id.* at 21–22.) Specifically, Antieau argued that the court erred by using Petitioner's lack of remorse as a basis for finding that Petitioner suffered from anti-social personality disorder. The PCR court denied the claims.

On direct appeal, Antieau raised 10 claims, including the ineffective assistance claims, claims challenging the aggravating factors, and a claim that substantial mitigation evidence called for leniency. (Doc. 21, Ex. A.) The Arizona Supreme Court found the claims without merit.

During the PCR proceedings, on June 25, 1990, Antieau requested the appointment of an investigator and a mental health expert. (ROA 323.) Antieau argued that he needed expert assistance to dispute the finding that Petitioner had an anti-social personality disorder. (ROA 325.) The court granted the motion on July 19, 1990. (ME 7/19/90.) On August 10, 1990, Antieau moved for Dr. Otto Bendheim, a psychiatrist, to be appointed as Petitioner's mental health expert. (ROA 328.) The court granted the

motion on October 31, 1990. (ME 10/31/90.) The court also granted Antieau's motion to extend the deadline for filing a supplemental PCR petition to November 15, 1990. (*Id.*) On November 13, 1990, Antieau again moved to extend the filing deadline, arguing that Dr. Bendheim needed additional time to complete his examination of Petitioner. (ROA 337.)

Antieau filed the second supplemental petition on November 15, 1990. (ROA 339.) Along with the petition he filed a request for additional funds for Dr. Bendheim. (ROA 338.) Antieau stated that Dr. Bendheim, "having reviewed the mental health reports, the testimony, and the Court's findings . . . will testify that . . . there are very weak scientific grounds for the distinction between narcissistic personality disorder and anti-social personality disorder" and "an alternative diagnosis of mixed personality disorder appears appropriate, at least as to Petitioner, and should have at least been considered at the time of the original examinations." (*Id.*) In his reply brief, Antieau reiterated that Dr. Bendheim questioned Tilden's diagnosis of narcissistic personality disorder and Petitioner's diagnosis of antisocial personality disorder, but that an examination of Petitioner was still necessary. (ROA 348 at 3.) Antieau asked the court to "either reconsider its sentencing decision without any reference to this elusive and ill-founded psychological 'distinction' or . . . provide Petitioner with the resources necessary to demonstrate to the Court that the distinction, at least in this case, is unsound." (*Id.*) Antieau attached to the filing a letter from Dr. Bendheim. (ROA 348, attachment.) In the letter Dr. Bendheim acknowledged that Antieau had asked him to explain the distinction

1
2
3
4

between narcissistic personality disorder and sociopathic personality disorder. (*Id.*) Dr. Bendheim listed the materials he had reviewed but stated that, in order to reach a more precise diagnosis of Petitioner, he would need to perform an examination.[8] (*Id.*)

5
6
7
8
9
10
11
12
13
14
15

The court denied the motion for additional funding, explaining that it was not "persuaded that further funds should be expended for purposes of securing a third defense report." (Doc. 21, Ex. F at 3–4; ME 4/19/91.) The court found the request "not appropriate in the context of post-conviction relief proceedings." (*Id.* at 4.) The court also noted that Petitioner's diagnosis of anti-social personality disorder was not the only basis for imposing a death sentence. (*Id.* at 4.) Finally, the court explained that Petitioner "had the benefit of two mental health experts and more than sufficient time to present this evidence at the 703 [aggravation/mitigation] hearing." (*Id.*)

16
17
18
19
20
21
22
23

Antieau filed a motion for rehearing. (Doc. 21, Ex. G; ROA 352.) He argued that the court had misconstrued the mitigation evidence by basing its sentencing decision on Petitioner's lack of remorse and the "pseudo-scientific distinction between 'anti-social personality disorder and 'narcissistic personality disorder.'" (*Id.* at 2.) Antieau then asserted that Petitioner was entitled to an evidentiary hearing because his "ineffective assistance of counsel claims are not raisable on appeal." (*Id.*)

24
25
26

The court denied the motion for rehearing. (*Id.*, Ex. H; ROA 355.) The court reiterated that it did not improperly use Petitioner's "lack of empathy or feelings" in its

27
28

---

[8] According to the invoice submitted by Dr. Bendheim, he performed a total of 3 and a half hours of work on the case, which included record review and telephone conferences with Antieau and Dr. Bayless. (*Id.* at 352, attachment.)

sentencing decision. (*Id.*)

As noted above, the record shows that during the first round of PCR proceedings Antieau also moved for the appointment of an investigator. (ROA 323.) The court granted the motion, and appointed Mary Durand. (ME 8/13/90.) In his motion to extend the filing deadline, Antieau stated that Durand "has not yet completed her work." (ROA 334.) In a declaration dated February 1, 2013, however, Durand states that she does not recall whether she actually performed any investigatory work for Antieau. (Doc. 149-9.)

In his third round of PCR proceedings, Petitioner did raise a claim of ineffective assistance of counsel at sentencing, specifically alleging that Iniguez failed to investigate and present mitigating evidence and failed to obtain an independent mental health expert. (Doc 21, Ex. X at 96-115, 128–37.) As discussed in more detail below, in support of this claim Petitioner filed a number of exhibits, including Petitioner's medical and education records (ROA 417, Ex's. A, E); affidavits from Tilden's trial lawyers, Roland Steinle and Brent Graham, who offered criticisms of Iniguez's performance, including his failure to secure an independent mental health examination of Petitioner (Doc. 126, Ex's. I, J); a declaration from Petitioner's aunt, Marlene Tilden (Doc. 127, Ex. P); and a declaration from psychologist Dr. Katherine DiFrancesca, who elaborated on Petitioner's difficult family background and substance abuse issues (*id.*, Ex. Q). The state court found this claim precluded and did not address the merits. (Doc. 21, Ex. Y at 1.)

c.      Application of *Martinez*

To excuse the procedural default of Claim 17, Petitioner must show that Antieau's performance was ineffective under *Strickland*. To accomplish that, Petitioner must establish that Antieau's performance was deficient and there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. *Clabourne*, 745 F.3d at 377.

### i.    PCR counsel's performance was not deficient

Criminal defendants are entitled to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)). "That standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

As noted above, the inquiry under *Strickland* is highly deferential and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Under *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. at 788. There is a "strong presumption" that

counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Id.* at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)).

In assessing Antieau's post-conviction performance, the Court is guided by the analogous law applying *Strickland* to direct appeal counsel. To be entitled to relief on a claim of ineffective assistance of appellate counsel, a petitioner "must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue." *Moormann v. Ryan,* 628 F.3d 1101, 1106 (9th Cir. 2010) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). The petitioner must also show prejudice, "which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal." *Id.*; *see also Clabourne*, 745 F.3d at 377 (explaining that prejudice from PCR counsel's performance requires showing "a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different"); *Sexton*, 679 F.3d at 1157.

The Supreme Court has emphasized that "effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible,

or at most on a few key issues."); *see Sexton*, 679 F.3d at 1157 ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim."). In *Smith v. Robbins*, the Court explained that '[n]otwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." 528 U.S. at 288. Given appellate counsel's wide discretion in exercising professional judgment, the presumption of effective assistance of counsel can ordinarily be overcome "only when ignored issues are clearly stronger than those presented. . . ." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)); *see also Murray v. Carrier*, 477 U.S. 478, 486–87 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default.").

The Court finds that Antieau's performance was not objectively unreasonable. As discussed above, on appeal and during the PCR proceedings, Antieau raised a claim that trial counsel was ineffective for failing to move to sever Petitioner's trial, which led, among other outcomes, to the presentation of contrasting mental health diagnoses at sentencing. Antieau also challenged Petitioner's death sentence on several grounds. While he did not raise a claim directly challenging Iniguez's failure to secure an independent mental health expert, he did argue, based on Dr. Bendheim's input, that anti-social personality disorder was not a proper diagnosis and should not have been a basis for the court's sentencing decision.

In *Clabourne*, by contrast, there was "no dispute" that post-conviction counsel's

1
2

performance was deficient. As the Ninth Circuit noted:

3
4
5
6
7
8

> Clabourne's post-conviction counsel, who had no experience with Arizona post-conviction proceedings, filed several postconviction petitions in state court that failed to comply with Arizona's procedural rules. After admonishing the lawyer to comply with the rules and assert valid claims, the Arizona post-conviction court denied all claims with prejudice for his failure to comply. On appeal from that denial by the trial level court, post-conviction counsel abandoned almost all claims, including the two *Strickland* claims arising from Clabourne's resentencing. *Strickland*'s first prong, as applied to Clabourne's post-conviction counsel, is satisfied.

9

745 F.3d at 378.

10
11
12
13
14
15
16
17
18

In sum, taking into account that *Strickland*'s standard for evaluating counsel's performance is highly deferential, the Court finds that Petitioner has not overcome the "strong presumption" that Antieau's performance was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see Harrington*, 131 S. Ct. at 790. The issues raised by Antieau, which included a challenge to the sentencing court's handling of the mental health evidence, were not clearly weaker than a claim of ineffective assistance of trial counsel.

19
20

ii.   PCR counsel's performance was not prejudicial

21
22
23
24
25
26

Even if Antieau's performance was deficient, the cause element under *Martinez* is not satisfied because Petitioner cannot show that he was prejudiced by Antieau's performance. *Clabourne*, 745 F.3d at 377–78. There is not a reasonable probability that the result of the PCR proceedings would have been different if Antieau had raised claims alleging ineffective assistance of counsel at sentencing. *Id.*

27
28

The trial judge presided over the first round of PCR proceedings. In her order denying the PCR petition, she addressed Antieau's argument that the court had misconstrued the mental health evidence at sentencing by finding that Petitioner suffered from anti-social personality disorder and was incapable of remorse. (ME 4/19/91 at 4.) The court indicated that her decision to sentence Petitioner to death did not depend on his diagnosis, explaining that "it appears that it is Petitioner who has taken one aspect of the Court's sentencing as if it were the only basis for the Court's determination of the appropriate and lawful sentence." (*Id.*; *see* ROA 355.) Under these circumstances, it is clear that Petitioner was not prejudiced by Antieau's failure to raise a claim that trial counsel performed ineffectively with respect to evidence of Petitioner's mental condition. Because the sentencing decision did not depend on Petitioner's mental health diagnosis, raising such a claim could not have affected the court's PCR ruling.

Petitioner contends that trial counsel performed ineffectively by failing to further investigate and present mitigating evidence of Petitioner's impoverished and dysfunctional family background, his medical history, and his struggles with alcohol abuse. Petitioner argues in turn that Antieau performed ineffectively as PCR counsel by failing to raise a claim attacking trial counsel's performance. Again, Petitioner was not prejudiced by this aspect of Antieau's performance. First, as described above, the court at sentencing had before it extensive information concerning Petitioner's background. One of the pre-sentence reports noted that "there was a great deal of dysfunction in the family" and that Petitioner's "family had very little furniture and household provisions

and on many occasions there was no food in the house." (ROA 254 at 7.) Another pre-sentence report outlined Petitioner's medical history, listing various injuries and illnesses. (ROA 232 at 9.) It also stated that Petitioner's mother and stepfather had drinking problems (*id.* at 7), an argument Iniguez raised in his sentencing memorandum (ROA 229 at 2.)

Both reports stated that Petitioner began drinking alcohol at a young age and had experienced adverse consequences as a result. (*See* ROA 232 at 7–8.) At sentencing, Iniguez argued that Petitioner was intoxicated on "jungle juice" at the time of the murders. (RT 1/13/89 at 62, 75.)

Petitioner raised the allegations in Claim 17 in his third PCR petition. (Doc. 21, Ex. X.) Her supported the claim with additional evidence about his background and psychological condition, as well as trial counsel's performance at sentencing.

In her August 1996 affidavit, Dr. DiFransesca painted a grimmer picture of the poverty and dysfunction of Petitioner's childhood home. (Doc. 127-4, Ex. Q.) She stated that Petitioner's mother and stepfather were both alcoholics and that Petitioner witnessed frequent violent quarrels between the couple. (*Id.* at 2.) Dr. DiFransesca also offered a revised version of Petitioner's substance abuse history. She reported that Petitioner began drinking hard liquor at age eight and experienced alcoholic blackouts as an adolescent. (*Id.* at 3.) She also indicated that Petitioner "huffed" paint thinner and other substances and smoked marijuana and hashish. (*Id.*) Dr. DiFransesca opined that Petitioner does not have anti-social personality disorder but, in contrast to the findings made by the trial

court, is capable of experiencing remorse and learning from his mistakes. (*Id.*) Instead, Petitioner "suffers from psychological and mental disorders resulting from his alcoholism and other substance abuse, his history of physical and emotional neglect, and his medical history." (*Id.*)

Dr. DiFransesca also suggested that it was Petitioner's Native American heritage, rather than a personality disorder, that prevented him from reacting emotionally or showing remorse at his trial. (*Id.* at 5.) She stated that Petitioner was "caught up in the styles of his opposing worlds, Native American culture and white-dominated culture." (*Id.* at 5–6.) Dr. DiFransesca also opined that Petitioner may suffer from neurological deficits as a result of his substance abuse and unspecified head trauma. (*Id.* at 4.) She recommended neurological testing. (*Id.*)

Petitioner also submitted an affidavit from his aunt, Marlene Tilden. (Doc. 127-3, Ex. P.) She stated that Petitioner had no contact with his biological father, who was white, and that he was raised primarily by his grandmother. (*Id.* at 1.) Ms. Tilden also indicated that Petitioner and his mother moved frequently, living in Phoenix, New Mexico, Washington, Colorado, Oklahoma, and South Dakota. (*Id.* at 2.) Petitioner frequently missed school due to his severe asthma. (*Id.*)

Ms. Tilden stated that alcoholism was rampant in Petitioner's family. (*Id.* at 2.) Petitioner's mother and stepfather were married in 1976, when Petitioner was eight. (*Id.*) His stepfather was also an alcoholic, and there was a great deal of physical violence in

1
2

the household. (*Id.* at 2–3.) The family lived in poverty. (*Id.* at 3.) Petitioner lived on a

3

reservation for the first time when he was 14. (*Id.*)

4

Petitioner submitted affidavits from counsel for co-defendant Tilden. Mr. Steinle,

5
6

Tilden's lead counsel, stated that he advised Petitioner's trial counsel not to request a

7

mental health examination under Rule 26.5 because the results of such an examination,

8

which may include information harmful to the defendant, are provided to the court. (Doc.

9

126-6, Ex. I at 3–4.) Notwithstanding this advice, Iniguez twice moved for examinations

10
11

under Rule 26.5 rather than seeking a private exam, the results of which did not have to

12

be disclosed to the court. (*Id.*) Tilden's co-counsel, Brent Graham, provided a similar

13

affidavit. (Doc. 126–7, Ex. J.)

14

The state court denied the third PCR petition. (*Id.*, Ex. Y.) It found the ineffective

15
16

assistance claims to be procedurally defaulted because they had not been previously

17

raised. (*Id.*) Alternatively, the court found the claims not colorable. (*Id.*)

18

This Court concludes that there is not a reasonable probability that the trial court

19
20

would have granted relief if Antieau had raised these same allegations during the first

21

round of PCR proceedings. In rejecting the PCR petition, the state court addressed

22

Antieau's argument that Petitioner did not suffer from antisocial personality disorder. The

23
24

court explained that its sentencing decision was not based on that diagnosis, and denied

25

Antieau's motion for additional funding for Dr. Bendheim. *Cf. Leavitt v. Arave*, 646 F.3d

26

605, 610 (9th Cir. 2011) (holding trial counsel did not perform ineffectively at

27
28

resentencing by failing to seek a third expert opinion, where judge had previously stated that defendant's mental health was not likely to be a significant factor at sentencing).

Moreover, much of the evidence Petitioner cites is cumulative to the evidence that was before the trial court at sentencing. This included information about Petitioner's difficult background and dysfunctional family life, which was contained in the presentence reports and elsewhere. Iniguez argued in mitigation that Petitioner experienced difficulty negotiating between Native American and white society. He also argued that Petitioner was intoxicated at the time of the crimes. Information about Petitioner's past alcohol abuse was set out in the presentence reports, which also listed some of Petitioner's medical history.

The circumstances of this case are similar to those in *Van Hook*, 558 U.S. 4, where the Supreme Court rejected a claim that defense counsel were ineffective based on an insufficient mitigation. The Court noted that counsel had spoken with the defendant's mother, father, and aunt, and with a family friend; met with two expert witnesses; reviewed military and medical records; and considered enlisting a mitigation specialist. *Id.* at 18. Counsel also presented evidence that the petitioner began drinking and using drugs as a child, witnessed his father abuse his mother, had violent fantasies, attempted suicide five times, suffered from borderline personality disorder, consumed drugs and alcohol on the day of the crime, and may have been motivated by a "homosexual panic." *Id.* at 18–19. The Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of the defendant's relatives or the therapists

who treated his parents.[9] *Id.* at 19.

Similarly, in *Cox v. Ayers*, the petitioner argued that counsel performed ineffectively at sentencing because he "did not obtain all public records regarding his family; did not interview additional family members, counselors, friends, or teachers; and decided not to present retained experts as witnesses." 613 F.3d 883, 892.

During the penalty phase of his trial, Cox's counsel focused on four arguments. *Id.* at 893. "First and foremost," counsel argued that Cox was not the actual shooter. *Id.* Counsel further argued in mitigation that a sentence of life imprisonment is worse than a death sentence, that Cox was a valuable human being who had a traumatic childhood, and that Cox had been influenced or manipulated by his gang. *Id.*

Counsel called seven witnesses to testify on Cox's behalf during the penalty phase. *Id.* Four of the witnesses were close relatives, including Cox's great grandmother, grandmother, sister, and brother. *Id.* They testified that Cox, who rarely saw his father and whose mother was an abusive alcoholic, was raised by his great grandmother, who enrolled him in Boy Scouts and gave him an allowance and a bike. *Id.* The witnesses all testified that they wanted to see Cox live. *Id.*

Counsel also called a school administrator and a teacher who knew Cox during his adolescence. *Id.* at 893–94. They testified that Cox exhibited good behavior until he until he became involved in one of the gangs that were prevalent in the neighborhood. *Id.*

---

[9] Van Hook had also criticized "counsel's failure to obtain an independent mental-health expert and their reliance on (and failure to object to harmful evidence in) a presentence investigation report." 558 U.S. at 18, n.2. He ultimately "concede[d], however, that neither ground is a 'basis for issuing the writ'. . . " *Id.*

Finally, counsel presented testimony from a former nurse at San Quentin, who described the harsh conditions Cox would face as a prisoner serving a life sentence there. *Id.* at 894.

The Ninth Circuit found that counsel's performance was not deficient. The court explained that "[c]ounsel reasonably decided not to present, and not to look further for, evidence concerning Petitioner's character and emotional state." *Id.* at 897. The court noted that the decision not to present such evidence "reflected counsel's strategic choice to emphasize their primary argument at the penalty phase: that [Cox] was not the shooter." *Id.* Moreover, counsel reasonably believed that additional evidence about Cox's troubled background "would only have raised inferences that his abusive childhood turned him into a hardened criminal who was quite capable of murdering four people." *Id.* Therefore, presenting "further evidence about [Cox's] childhood and gang activity would have suggested violent propensities at odds with counsel's goal of portraying [Cox] as less culpable." *Id.*

Many of these circumstances were also present in Iniguez's representation of Petitioner at sentencing. Iniguez used the testimony of close relatives to argue that Petitioner was a good person who was loved by his family. He argued that Petitioner did not have a violent record and the murders were out of character, the result of his intoxication on beer and "jungle juice." He argued that Petitioner was courteous and intelligent and would not pose a danger in the future, notwithstanding his diagnosis of antisocial personality disorder. He argued that at the time of the crimes Petitioner was experiencing difficulty adjusting to life in white society. Moreover, evidence of

Petitioner's family and social background was before the court in the presentence report, and additional evidence of his positive qualities was set forth in letters from family and acquaintances.

Furthermore, the "more complete picture portrayed of [Petitioner's] dysfunctional family life does not depict a life history of [Petitioner] himself that is nightmarish as it was for the petitioners in cases . . . where newly produced evidence in mitigation has carried the day." *Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011). These cases, which include *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362 (2000), are readily distinguished from Petitioner's case by both the availability and the quality of the mitigating evidence that counsel failed to present at sentencing.

In *Rompilla*, the evidence counsel failed to uncover and present—despite the fact that the prosecutors had provided defense counsel with the file containing the information—showed that during Rompilla's childhood he was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing by his parents. 545 U.S. at 391–92. In *Wiggins*, trial counsel failed to present evidence that Wiggins suffered continuous abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and was deemed to have diminished mental capacities. 539 U.S. at 535. In *Williams,* sentencing

counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395. The new evidence showed that Williams had been severely and repeatedly beaten by his father, had been committed to the custody of the social services bureau, had no schooling beyond sixth grade, and was borderline mentally retarded. *Id.* at 370–71.

Petitioner's newly proffered evidence gives additional details to the broad outlines contained in the presentence reports, psychological evaluations, testimony, and letters considered by the court at sentencing. It depicts a home life in which the alcoholism of Petitioner's mother, stepfather, and extended family led to neglect, poverty, and a lack of stability. However, the new evidence does not indicate that Petitioner himself was subjected to physical or sexual abuse. *See Rhoades*, 638 F.3d at 1052 ("While it is not necessary for abuse to have been aimed at Rhoades in order to be mitigating, that there is no evidence it was makes his case less compelling in light of the strength of the aggravating circumstances than the *Rompilla, Wiggins*, and *Williams* line of cases.").

Based on these circumstances, there is not a reasonable probability that the trial court would have granted relief if Antieau has raised an ineffective assistance claim during the PCR proceedings. The claim would have been based on Iniguez's failure to present largely cumulative evidence or evidence the trial court itself indicated was not essential to its sentencing decision.

The Ninth Circuit's analysis in *Leavitt*, 646 F.3d 605, further illustrates the weaknesses of the claim alleging that Petitioner was prejudiced by Antieau's failure to challenge Iniguez's performance at sentencing. In *Leavitt*, the petitioner argued that counsel at resentencing performed ineffectively by failing to further investigate the petitioner's mental health and failing to request an MRI. During that proceeding three mental health experts had diagnosed Leavitt with an antisocial personality disorder. *Id.* A CT scan was also performed, with results suggesting a "possibility" of disease. *Id.* The trial court nevertheless denied the Leavitt's motion for an MRI, explaining that "any further evidence of the mental condition of the defendant . . . will not be a significant factor in the resentencing." *Id.* at 607, 611.

The Ninth Circuit found that counsel's performance was neither deficient nor prejudicial. First, the court found that counsel's "decision to forego further investigation into Leavitt's mental health condition was reasonable" based on what had occurred during the initial sentencing. *Id.* at 609. The court explained that the evidence suggesting possible cognitive impairment was equivocal, in that it was also consistent with the anti-social personality disorder. *Id.* at 609–10. The court also noted that counsel reasonably believed that a renewed motion for an MRI test would again be denied. *Id.* at 610–11. Finally, the court explained that counsel acted reasonably in "switching gears" away from mental-health based mitigation strategy, which had failed at the original sentencing, and toward an approach emphasizing that the petitioner was a "pretty good guy" who did not deserve a death sentence. *Id.* at 612. Evidence that Leavitt suffered from brain damage

which led to his violent behavior would have run counter to that approach. *Id.*

The Ninth Circuit also found that Leavitt was not prejudiced by resentencing counsel's performance. As noted, there was not a reasonable probability the trial court would have granted a motion for MRI testing if counsel had filed one. *Id.* at 613. In fact, the court considered and rejected a request for additional psychological testing made by Leavitt himself. *Id.* at 613–14. The court further noted that when an MRI was finally taken, during federal habeas proceedings, the results were "tentative" and "highly speculative." *Id.* at 614. Finally, the court again emphasized that evidence of brain injury, to the extent it was given any weight, could have been treated as aggravating rather than mitigating, by showing that the petitioner was "simply beyond rehabilitation." *Id.* at 614–15 (citing *Cullen v. Pinholster*, 131 S. Ct. 1388, 1396–97 (2011)).

A challenge to Iniguez's performance at sentencing, had Antieau raised such a claim, would have featured the same weaknesses as the ineffective assistance claim rejected in *Leavitt*. Antieau enlisted an expert to dispute Petitioner's anti-social personality disorder diagnosis. However, like the trial court in *Leavitt*, the judge in Petitioner's case indicated that mental health evidence was not essential to her sentencing decision; accordingly, the court denied additional funding and rejected Antieau's argument that in sentencing Petitioner to death she had misconstrued evidence about his mental health. There is not a reasonable probability that a claim alleging that Iniguez performed ineffectively at sentencing by failing to secure an additional mental health expert would have resulted in a different ruling.

In addition, there is not a reasonable probability of a different PCR result if Antieau had challenged Iniguez's failure to include more details about Petitioner's childhood, social background, education, and medical history. A challenge to this aspect to Iniguez's performance suffers from key drawbacks. Iniguez presented mitigation evidence from Petitioner's mother and stepfather, among other witnesses. This evidence focused on Petitioner's good qualities. As described above, along with the mental health and presentence reports, the testimony from Petitioner's parents also outlined his educational and medical history. To the extent that additional, negative information about Petitioner's upbringing was not cumulative to evidence that was presented, such evidence would have cast doubt on the positive information Iniguez offered through the testimony of Petitioner's parents.[10] *See Van Hook*, 558 U.S. at 11 (rejecting argument that counsel performed ineffectively by failing to interview family members "who could have helped counsel narrate the true story of Van Hook's childhood experiences" and explaining that "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative. . .").

In *Leavitt* the court identified another weakness in the petitioner's ineffective assistance claim; namely, the nature of the mental health evidence counsel failed to present. 646 F.3d at 614. This fault characterizes Petitioner's ineffective assistance claim

---

[10] Additional information about Petitioner's family background is contained in declarations attached to Petitioner's motion. (Doc. 149-9, Ex.'s 12–21.) The declarations contain information portraying Petitioner in a positive light, as a good-hearted child growing up amid the chaos caused by the alcoholism prevalent in his extended family which involved incidents of domestic violence between Petitioner's mother and stepfather, inadequate supervision, and exposure to drugs and alcohol.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

as well. Like the petitioner in *Leavitt*, Petitioner underwent additional mental health examinations during the federal habeas proceedings, thereby obtaining diagnoses that were not considered by the state court. Petitioner's new diagnoses, like those in *Leavitt*, are tentative and speculative.

Dr. Charles Heller, a psychologist with expertise in Native American mental health and cultural issues, evaluated Petitioner in 2006. (Doc. 149-9, Ex. 10.) He concluded that Petitioner "presented with a group of symptoms and indications strongly suggestive of PTSD" (Post-Traumatic Stress Disorder) but did "not meet the full criteria for PTSD." (*Id.* at 35.) Instead, he diagnosed Petitioner with "an anxiety disorder not otherwise specified with PTSD features." (*Id.* at 35.) Elsewhere in his report, however, Dr. Heller seems to conclude that Petitioner did suffer from PTSD. (*Id.* at 37.) Whether or not Dr. Heller in fact diagnosed Petitioner with PTSD, he differentiated Petitioner's condition from "classical PTSD," explaining that Petitioner's condition "is due to the chronic nature of extreme stress typical of life experienced by Native Americans on a reservation or urban environment." (*Id.* at 34.)

With respect to the murders, Dr. Heller opined that Petitioner's intoxication "exposed rage that was deeply suppressed and not seen prior to the crime" and that "[t]he violent nature of the crime was uncharacteristic of Sean's life." (*Id.* at 36.) Dr. Heller further opined that, "[u]nfortunately due to his deep, hidden emotional blocks and messages which were ingrained by his life circumstances, Sean had an uncontrollable impulse to sabotage his future." (*Id.*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

With respect to the burglary, Dr. Heller opined that it "was clearly a crime that was perpetrated by someone who wanted to remain a teenager and avoid growing up." (*Id.* at 37.) Petitioner did not want to grow up, Dr. Heller stated, because he had been exposed to the violent deaths of adults. (*Id.*) According to Dr. Heller, "[s]ymptoms of PTSD and specifically his uncontrollable rage were not visible due to Sean's idiosyncratic withholding of emotion and other coping mechanisms until the pressure (and anxiety) of being adult coupled with a highly intoxicating substance caused him to act-out in the way he did." (*Id.*)

Dr. Heller also concluded that Petitioner had been improperly diagnosed with anti-social personality disorder at the time of sentencing. (*Id.*) Finally, citing "numerous head injuries suffered by Sean in his childhood and adolescence," Dr. Heller recommended a complete neuropsychological examination, including a PET scan and MRI, to determine if Petitioner has brain impairment. (*Id.* at 40.)

Dr. Heller further opined that Petitioner's apparent lack of emotions and remorse was the result of his Native American cultural heritage. (*Id.* at 5–6.) According to Dr. Heller, the trial court erred in reading Petitioner's lack of visible emotion as an inability to experience remorse. (*Id.*)

Dr. Pablo Stewart, a psychiatrist, interviewed Petitioner and reviewed the record, including Dr. Heller's report. In a brief letter to Petitioner's counsel, dated January 22, 2013, Dr. Stewart reported the results of his "initial psychiatric evaluation." (Doc. 149-9, Ex. 8.) Dr. Stewart opined to a reasonable degree of medical certainty that Petitioner

currently suffers from PTSD and suffered from the condition at the time of the offenses. (*Id.*) He also opined that it is "very likely" that at the time of the offenses Petitioner suffered from Autistic Spectrum Disorder, Major Depressive Disorder, and Substance-Related Disorder. (*Id.*) Dr. Stewart recommended a full set of neuropsychological tests and indicated that, depending on the results of those tests, he may also recommend an MRI or PET scan of Petitioner's brain. (*Id.*) The letter does not contain any analysis or discussion of the bases for Dr. Stewart's findings. (*Id.*) Petitioner does not proffer any evidence that further tests were performed.

The Ninth Circuit, confronted with similarly equivocal diagnoses in *Leavitt*, explained that "[s]uch opinions, which couch results in tentative language, are simply not enough to show prejudice." 646 F.3d at 614. Similarly, in *Rhoades*, the court found no prejudice where the petitioner proffered new expert reports during federal habeas proceedings. 638 F.3d at 1050. One of the experts "opined only that alcoholism and suicides in Rhoades's family 'very likely' play a genetic role in his mental health; that he 'was genetically loaded for substance abuse'; and that his chronic use of methamphetamine 'may well' have damaged his brain." *Id.*

The other expert in *Rhoades* was Dr. Stewart, who prepared a "working assessment" of the petitioner. *Id.* at 1048. The court found Dr. Stewart's conclusions "similarly indeterminate." *Id.* at 1050. For example, Dr. Stewart opined that Rhoades's family history placed him "at substantial risk" of developing mental health problems and that he "may" have been born with mental deficiencies. *Id.* The court then explained that

"[t]he mitigating value of Stewart's most concrete assessment, that Rhoades 'does suffer' from Post-traumatic Stress Disorder (PTSD), is lessened because his diagnosis admittedly does not satisfy the requirements of DSM–IV for this condition." *Id.* (citing *Comer v. Schriro*, 463 F.3d 934, 944 (9th Cir. 2006)).

Noting that the reports "talk in terms of conditions that Rhoades 'likely' has or 'may' have," the Ninth Circuit concluded that "[s]peculation about potential brain dysfunctions or disorders "is not sufficient to establish prejudice." *Id.* (citing *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009)).

In Petitioner's case, Dr. Heller's PTSD diagnosis is equivocal, with Dr. Heller acknowledging that Petitioner did not meet the "full criteria" for the condition. (Doc. 149-9, Ex. 10 at 35.) Dr. Heller recommended additional testing, including a PET scan and MRI. (*Id.* at 40.) Dr. Stewart, in a letter reporting the results of his initial evaluation, stated that he believed to a reasonable degree of medical certainty that Petitioner suffers from PTSD, but that opinion is not supported by any discussion of the applicable criteria. (*Id.*, Ex. 9.) Dr. Stewart also indicated that neuropsychological testing, possibly followed by a PET scan or MRI, was necessary to confirm his diagnoses. (*Id.*)

Moreover, although Dr. Heller opined that Petitioner's apparent lack of remorse during the trial was a reflection of his cultural background, the record is clear that Petitioner did not express remorse because he maintained he was innocent of the murders.

In sum, the new evidence of Petitioner's mental status is tentative and speculative. The failure to present such evidence at sentencing does not form the basis for a finding of

prejudice. *See Leavitt*, 646 F.3d at 614; *Rhoades*, 638 F.3d at 1050. Therefore, if Antieau had raised a claim of ineffective assistance of counsel at sentencing, there was not a reasonable probability that "the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377.

### III.   EVIDENTIARY DEVELOPMENT

Petitioner seeks expansion of the record and an evidentiary hearing on the *Martinez* issue and Claims 1-H and 17. (Doc. 149 at 73–84.) He seeks to expand the record with Mary Durand's declaration (Doc. 149-9, Ex. 9), Dr. Heller's report (*id.*, Ex. 10), Dr. Stewart's letter (*id.*, Ex. 8), a declaration from co-defendant Tilden (*id.*, Ex. 12), and declarations from other family members and acquaintances (*id.*, Ex's. 11, 13–21.) Petitioner also seeks an evidentiary hearing to present testimony from Steinle and Graham, Tilden's counsel; Gloria Castillo, a defense investigator appointed during Petitioner's trial; mitigation fact witnesses, including the declarants in Exhibits 12–21; Drs. Stewart and Heller; and experts in mitigation and capital defense. (Doc. 149 at 80–82.)

Respondents oppose evidentiary development, arguing that Petitioner was not diligent in state court because he could have presented this information during the third PCR proceedings.[11] (*See* Doc. 156 at 77.)

---

[11] For the purposes of Petitioner's request for evidentiary development, the Court concludes that *Cullen v. Pinholster*, 131 S. Ct. 1398, does not limit the consideration of new evidence concerning Claims 1-C and 1-H.

Under 28 USC § 2254(e)(2), a petitioner is generally not entitled to evidentiary development on a claim for relief where the petitioner "failed to develop the factual basis of a claim in State court proceedings" due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoners counsel." In *Dickens*, however, the Ninth Circuit held that § 2254(e)(2) "does not bar a hearing before the district court to allow a petitioner to show 'cause' under *Martinez*" because a petitioner seeking to show cause based on ineffective assistance of PCR counsel is not asserting a claim for relief. 740 F.3d at 1321. Therefore, the court explained,

> a petitioner, claiming that PCR counsel's ineffective assistance constituted "cause," may present evidence to demonstrate this point. The petitioner is also entitled to present evidence to demonstrate that there is "prejudice," that is that petitioner's claim is "substantial" under *Martinez*. Therefore, a district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*.

*Id.*

Accordingly, the Court will grant Petitioner's motion to expand the record. The record will be expanded to include Exhibits 8–10 and 12–21 to Petitioner's Supplement Brief. (Doc. 149-1.)

However, the Court will deny Petitioner's request for an evidentiary hearing. "[A] district court in a habeas proceeding need not conduct full evidentiary hearings, but may instead 'expand the record . . . with discovery and documentary evidence." *Williams v. Woodford*, 306 F.3d 665, 688 (9th Cir. 2002) (quotation omitted); *see Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) ("[A district court] may avoid the necessity of an

expensive and time consuming evidentiary hearing in every [federal habeas] case. It may instead be perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and . . . even affidavits.").

Expansion of the record is sufficient here. With the exception of unnamed experts in capital litigation and mitigation, there are declarations from all of the witnesses who would testify at an evidentiary hearing. *See Phillips v. Ornoski*, 673 F.3d 1168, 1179 (9th Cir. 2012) ("Because, as the district court observed, no witnesses remained to testify at [the] hearing' who had not already been deposed, avoiding the time and expense of the live hearing was a legitimate reason to vacate the earlier order [granting a hearing]."). The Court is familiar with the standards applicable to counsel's performance in capital litigation and the components of an adequate mitigation investigation, so testimony from experts in those areas is unnecessary.

The record before the Court, which includes that the extensive records submitted during the PCR proceedings and the materials with which the record has been expanded, is sufficient for the Court to rule on Petitioner's claims.

## **CONCLUSION**

For the reasons discussed above, Petitioner's remanded claims are not governed by *Martinez/Trevino*. Even applying *Martinez*, the default of the remanded claims is not excused because PCR counsel did not perform ineffectively under the deferential standard of *Strickland*.

Accordingly,

**IT IS ORDERED** the procedural default of Claims 1-D, 1-H, and 17 is not excused under *Martinez*.

**IT IS FURTHER ORDERED** expanding the record to include Exhibits 8–10 and 12–21 to Petitioner's Supplement Brief. (Doc. 149-1.)

**IT IS FURTHER ORDERED** that the Clerk of Court shall forward of copy of this order to the Ninth Circuit Court of Appeals and shall terminate this matter.

Dated this 2nd day of October, 2014.


Paul G. Rosenblatt
United States District Judge